Benjamin Heikali (SBN 307466)
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-mail:  bheikali@faruqilaw.com

[Additional Captions on Signature Page]

*Attorney for Plaintiff Mark Kerry*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK KERRY, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | Case No.  3:19-cv-02535 |
| v. ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| QUANTENNA COMMUNICATIONS, INC., DR. SAM HEIDARI, MARK A. STEVENS, GLENDA MARY DORCHAK, JACK R. LAZAR, EDWIN B. HOOPER III, HAROLD E. HUGHES JR., and JOHN SCULL, ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

---

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Mark Kerry ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Quantenna Communications, Inc. ("Quantenna" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Quantenna, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Quantenna and ON Semiconductor Corporation ("ON Semiconductor").

2.     On March 27, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $24.50 in cash for each share of Quantenna stock they own (the "Merger Consideration").

3.     On May 3, 2019, in order to convince Quantenna shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading Proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.     While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

incomplete and misleading.

5.    In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Quantenna shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Quantenna's financial advisor, Qatalyst Partners LP ("Qatalyst") in support of its opinion that the Merger Consideration is fair to shareholders on which the Board relied.

6.    It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Quantenna shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1  traditional notions of fair play and substantial justice.

2      10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

3  78aa, as well as under 28 U.S.C. § 1391, because Quantenna maintains its principal executive

4  offices in this District.

5                                          **PARTIES**

6      11.     Plaintiff is, and at all relevant times has been, a holder of Quantenna common stock.

7      12.     Defendant Quantenna is incorporated in Delaware and maintains its principal

8  executive offices at 1704 Automation Parkway, San Jose, California 95131. The Company's

9  common stock trades on the NASDAQ under the ticker symbol "QTNA."

10     13.     Individual Defendant Dr. Sam Heidari is Quantenna's Chief Executive Officer and

11 Chairman and has been a director of Quantenna since March 2011.

12     14.     Individual Defendant Mark A. Stevens is Quantenna's has been a director of

13 Quantenna since July 2016.

14     15.     Individual Defendant Glenda Mary Dorchak has been a director of Quantenna since

15 June 2018.

16     16.     Individual Defendant Jack R. Lazar has been a director of Quantenna since July

17 2016.

18     17.     Individual Defendant Edwin B. Hooper III has been a director of Quantenna since

19 December 2014.

20     18.     Individual Defendant Harold E. Hughes Jr. has been a director of Quantenna since

21 December 2014.

22     19.     Individual Defendant John Scull has been a director of Quantenna since November

23 2014.

24     20.     The Individual Defendants referred to in paragraphs 13-19 are collectively referred

25 to herein as the "Individual Defendants" and/or the "Board."

26

27

28
                                           - 3 -
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

1

**CLASS ACTION ALLEGATIONS**

2      21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself

3   and the other public shareholders of Quantenna (the "Class").   Excluded from the Class are

4   Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated

5   with any Defendant.

6      22.     This action is properly maintainable as a class action because:

7            a.     The Class is so numerous that joinder of all members is impracticable.  As

8   of April 29, 2019, there were approximately 39,000,000 shares of Quantenna common

9   stock outstanding, held by hundreds of individuals and entities scattered throughout the

10  country.   The actual number of public shareholders of Quantenna will be ascertained

11  through discovery;

12           b.     There are questions of law and fact that are common to the Class that

13  predominate over any questions affecting only individual members, including the

14  following:

15                   i)      whether Defendants disclosed material information that includes

16                           non-GAAP financial measures without providing a reconciliation of

17                           the same non-GAAP financial measures to their most directly

18                           comparable GAAP equivalent in violation of Section 14(a) of the

19                           Exchange Act;

20                   ii)     whether Defendants have misrepresented or omitted material

21                           information concerning the Proposed Transaction in the Proxy in

22                           violation of Section 14(a) of the Exchange Act;

23                   iii)    whether the Individual Defendants have violated Section 20(a) of

24                           the Exchange Act; and

25                   iv)     whether Plaintiff and other members of the Class will suffer

26                           irreparable harm if compelled to vote their shares regarding the

27

28

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

1   Proposed Transaction based on the materially incomplete and
2   misleading Proxy.

3      c.   Plaintiff is an adequate representative of the Class, has retained competent
4   counsel experienced in litigation of this nature, and will fairly and adequately protect the
5   interests of the Class;

6      d.   Plaintiff's claims are typical of the claims of the other members of the Class
7   and Plaintiff does not have any interests adverse to the Class;

8      e.   The prosecution of separate actions by individual members of the Class
9   would create a risk of inconsistent or varying adjudications with respect to individual
10   members of the Class, which would establish incompatible standards of conduct for the
11   party opposing the Class;

12      f.   Defendants have acted on grounds generally applicable to the Class with
13   respect to the matters complained of herein, thereby making appropriate the relief sought
14   herein with respect to the Class as a whole; and

15      g.   A class action is superior to other available methods for fairly and
16   efficiently adjudicating the controversy.

17                        **SUBSTANTIVE ALLEGATIONS**

18   **I.   The Proposed Transaction**

19      23.   Quantenna designs, develops and markets advanced high-speed wireless
20   communication solutions enabling wireless local area networking. The Company applies its
21   wireless systems and software expertise with high-performance radio frequency, mixed-signal and
22   digital semiconductor design skills to provide highly integrated Wi-Fi solutions.  Historically,
23   Quantenna's products have targeted communications service providers, service providers, and the
24   market for home networking applications, including home gateways, repeaters, mesh nodes and

25
26
27
28

- 5 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

video clients. The Company has been actively working to address additional markets including retail, outdoor, small and medium business, enterprise, industrial and consumer electronics.

24.     On March 27, 2019, Quantenna and ON Semiconductor issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

PHOENIX & SAN JOSE, Calif.--(BUSINESS WIRE)--ON Semiconductor Corporation (Nasdaq: ON) ("ON Semiconductor") and Quantenna Communications, Inc. (Nasdaq: QTNA) ("Quantenna") today announced that they have entered into a definitive agreement for ON Semiconductor to acquire Quantenna for $24.50 per share in an all cash transaction. The acquisition consideration represents equity value of approximately $1.07 billion and enterprise value of approximately $936 million, after accounting for Quantenna's net cash of approximately $136 million at the end of fourth quarter of 2018. The acquisition significantly enhances ON Semiconductor's connectivity portfolio with the addition of Quantenna's industry leading Wi-Fi technology and software capabilities.

"We are very pleased to welcome Quantenna to ON Semiconductor's team. The acquisition of Quantenna is another step towards strengthening our presence in industrial and automotive markets. The combination of ON's expertise in highly efficient power management and broad sales and distribution reach, and Quantenna's industry leading Wi-Fi technologies and software expertise creates a formidable platform for addressing fast growing markets for low-power connectivity in industrial and automotive applications," said Keith Jackson, president and chief executive officer of ON Semiconductor. "I am very excited about the opportunity this acquisition creates for customers, shareholders, and employees of the two companies."

"Today's announcement is great news for Quantenna employees and customers worldwide. As part of ON Semiconductor, Quantenna will benefit from a world-class organization in our commitment to providing the best end user experience for our customers," stated Dr. Sam Heidari, chairman and chief executive officer of Quantenna. "We are proud of our accomplishments and look forward to a smooth transition with the ON Semiconductor team to pursue exciting new opportunities for Quantenna's talented employees and reinforce our longstanding position as a leading Wi-Fi technology innovator."

Following consummation, the transaction is expected to be immediately accretive to ON Semiconductor's non-GAAP earnings per share and free cash flow, excluding any non-recurring acquisition related charges, the fair value step-up inventory amortization, and amortization of acquired intangibles.

The transaction is not subject to a financing condition. ON Semiconductor intends to fund the transaction through cash on hand and available capacity under its

- 6 -
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

existing revolving credit facility.

Completion of the transaction is subject to approval by Quantenna's stockholders, regulatory approvals and other customary closing conditions. The transaction has been approved by ON Semiconductor's and Quantenna's boards of directors and is expected to close in the second half of 2019. No approval of the stockholders of ON Semiconductor is required in connection with the proposed transaction.
Morrison & Foerster LLP served as legal advisor to ON Semiconductor. Qatalyst Partners acted as exclusive financial advisor to Quantenna, along with O'Melveny & Myers LLP, who served as legal advisor.

**Teleconference**

ON Semiconductor will host a conference call for the financial community at 5:00 p.m. Eastern Daylight Time (EDT), on March 27, 2019, to discuss this announcement. ON Semiconductor will also provide a real-time audio webcast of the teleconference on the Investors page of its website at http://www.onsemi.com. The webcast replay will be available at this site approximately one hour following the live broadcast and will continue to be available for approximately one year following the conference call. Investors and interested parties can also access the conference call through a telephone call by dialing (877) 356-3762 (U.S./Canada) or (262) 558-6155 (International). In order to join this conference call, you will be required to provide the Conference ID Number - which is 7271535.

**About ON Semiconductor**

ON Semiconductor (Nasdaq: ON) is driving energy efficient innovations, empowering customers to reduce global energy use. The Company is a leading supplier of semiconductor-based solutions, offering a comprehensive portfolio of energy efficient power management, analog, sensors, logic, timing, connectivity, discrete, SoC and custom devices. The Company's products help engineers solve their unique design challenges in automotive, communications, computing, consumer, industrial, medical, aerospace and defense applications. ON Semiconductor operates a responsive, reliable, world-class supply chain and quality program, a robust compliance and ethics program and a network of manufacturing facilities, sales offices and design centers in key markets throughout North America, Europe and the Asia Pacific regions. For more information, visit www.onsemi.com.

*ON Semiconductor and the ON Semiconductor logo are registered trademarks of Semiconductor Components Industries, LLC. All other brand and product names appearing in this document are registered trademarks or trademarks of their respective holders. Although the Company references its website in this news release, information on the website is not to be incorporated herein.*

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**About Quantenna Communications**

Quantenna (Nasdaq: QTNA) is the global leader and innovator of high performance Wi-Fi solutions. Founded in 2006, Quantenna has demonstrated its leadership in Wi-Fi technologies with many industry firsts. Quantenna continues to innovate with the mission to perfect Wi-Fi by establishing benchmarks for speed, range, efficiency and reliability. Quantenna takes a multidimensional approach, from silicon and system to software, and provides total Wi-Fi solutions. For more information, visit www.quantenna.com.

25.     Quantenna is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

**II.     The Materially Incomplete and Misleading Proxy**

26.     On May 3, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*The Materiality of Financial Projections*

27.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction. Here, the Proxy discloses "the Board expressed its support for using the

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

preliminary ten-year forecast in its review and consideration of strategic transactions. . . ." Proxy 38.

28.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101). Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions. In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K. *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

29.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

30.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual

results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

31. Here, Quantenna's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts to determine "the prospects and likelihood of realizing superior benefits through remaining an independent company, risks associated with remaining an independent company, and possible alternative business strategies[.]" Proxy 47.

32. As discussed further below, the non-GAAP financial projections here do not provide Quantenna's shareholders with a materially complete understanding of the assumptions and key factors considered in developing financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

33. The Proxy discloses that the financial projections were developed by the Company's management "in connection with Quantenna's evaluation of strategic alternatives and a potential strategic transaction involving Quantenna, at the direction of the Board. . . . [and] were made available to the Board and Qatalyst Partners. . . ." *Id.* at 49.

34. The Proxy further discloses that the financial projections "had been reasonably prepared on a basis reflecting the best currently available estimates and judgments of Quantenna's management of the future financial performance of Quantenna and other matters covered thereby." *Id.* at 50

35. The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2028 (the "Management Projections") for: (1) Non-GAAP COGS; (2) Non-GAAP Gross Profit; (3) Non-GAAP Operating Expense; (3) Non-GAAP Operating Income; (4) Net Operating Profit After Tax; (5) Unlevered Free Cash Flow; and (6) EBITDA but fails to provide (i) the line items used to

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 51.

36. The Proxy discloses that "Non-GAAP metrics exclude stock-based compensation expense, non-recurring items, including acquisition related costs, and changes to deferred tax balances[,]" *id.* at 51 n.1., but fails to provide values for the line items used in the calculation. *Id.*

37. Additionally, the Proxy provides a sensitivity analysis by applying the operating margin sensitivities to three revenue cases. *Id.* at 52. The sensitivity analysis states three different 2028 terminal revenue scenarios and three operating margins scenarios for various calendar years. *Id.*

38. The Proxy does not provide a complete implementation of the sensitivity analysis. The operating margin is disclosed, but there is no indication of if the operating margin is based off of GAAP or non-GAAP financials. Operating margin is calculated as operating income divided by earnings, and it is not clear if the Company has used GAAP operating income or non-GAAP operating income in the calculation. Furthermore, there is no indication as to how the sensitivities would affect the Net Operating Profit After Tax ("NOPAT"), Unlevered Free Cash Flows ("UFCF") or EBITDA. Moreover, the Proxy does not indicate which of the three cases disclosed in the sensitivity analysis is the most likely.

39. Thus, the Proxy's disclosure of these non-GAAP financial forecasts and the sensitivity analysis provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon. It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

40. The financial projections disclosed on page 51 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G, as a result of Defendants' failure to reconcile those non-GAAP

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1    measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions

2    and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9

3    because they are materially misleading, as shareholders are unable to discern the veracity of the

4    financial projections.

5        41.    As such, this information must be disclosed in order to cure the materially

6    misleading disclosures regarding both the financial projections developed by the Company as well

7    as the projections relied upon by the Company's financial advisors.

8        ***The Financial Projections Violate Regulation G***

9        42.    The SEC has acknowledged that potential "misleading inferences" are exacerbated

10   when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation

11   G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial

12   measures."[3]

13       43.    Defendants must comply with Regulation G.  More specifically, the company must

14   disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule

15   or other clearly understandable method) of the differences between the non-GAAP financial

16   measure disclosed or released with the most comparable financial measure or measures calculated

17   and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes

18   "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures

19   . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate

20

21

22   [1]    Non-GAAP financial measures are numerical measures of future financial performance
     that exclude amounts or are adjusted to effectively exclude amounts that are included in the most
23   directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

24   [2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of
     Regulation G.
25

26   [3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003),
     *available at* https://www.sec.gov/rules/final/33-8176.htm (last visited May 10, 2019) ("SEC, *Final
27   Rule*").

28

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

pricing of securities."[4]

44.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Quantenna included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

45.    The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] with *Youku Tudou Inc., et al.*, SEC Staff Comment

---

[4]    SEC, *Final Rule.*

[5]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/ (last visited May 10, 2019); Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited May 10, 2019).

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted) (last visited May 10, 2019).

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm (last visited May 10, 2019).

- 13 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

46.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).    Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

47.    In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial

---

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf (last visited May 10, 2019)

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm (last visited Jan. 11, 2019).  *See also Actel Corp.*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/00000000001060087/filename1.pdf (last visited May 10, 2019).  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/00000000000017025180/filename1.pdf (last visited May 10, 2019).  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions and reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such at the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on. *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited May 10, 2019).

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1   measures.  Nor can shareholders compare the Company's financial prospects with similarly

2   situated companies.

3       48.     Such projections are necessary to make the non-GAAP projections included in the

4   Proxy not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that Non-

5   GAAP financial measures "are not prepared in accordance with GAAP and should be considered

6   as a supplement to, not a substitute for, or superior to, the corresponding measures calculated in

7   accordance with GAAP."  Proxy 50.

8       49.     As such, financial projections are plainly material, and shareholders would clearly

9   want a complete and non-misleading understanding of those projections.

10      50.     In order to cure the materially misleading nature of the projections under SEC Rule

11  14a-9 as a result of the omitted information on page 51, Defendants must provide a reconciliation

12  table of the non-GAAP financial measures to the most comparable GAAP measures.

13          ***The Materially Misleading Financial Analyses***

14      51.     The summary of the valuation methodologies utilized by Qatalyst including the

15  utilization of certain of the non-GAAP financial projections described above by Qatalyst, in

16  connection with its valuation analyses, (*id.* at 53) is misleading in violation of Regulation 14a-9.

17  The opacity concerning the Company's internal projections renders the valuation analyses

18  described below materially incomplete and misleading, particularly as companies formulate non-

19  GAAP metrics differently. Once a proxy discloses internal projections relied upon by the Board,

20  those projections must be complete and accurate.

21      52.     With respect to Qatalyst's *Illustrative Discounted Cash Flow Analysis*, the Proxy

22  states that Qatalyst used the management projections to perform the discounted cash flow analysis

23  on Quantenna and performed alternate discounted cash flow analyses based on the sensitivities.

24  *Id.* at 54.  Qatalyst used management's forecasted UFCF for calendar years 2019 through 2027

25  and a discount rate of 10.5% to 14% to calculate the net present value of the Company's estimated

26  cash flows.  *Id.*  The discount rate of 10.5% to 14% was based on the Company's weighted average

27

28

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

cost of capital. *Id.* Qatalyst added the implied net present value of the terminal value of Quantenna, calculated by multiplying management's 2028 NOPAT forecast by multiplies of enterprise value to next twelve months estimated NOPAT ranging from 12x to 22x. *Id.* Qatalyst then added Quantenna's cash net of debt as of December 30, 2018, as provided by management, and divided by the number of fully diluted shares of Quantenna common stock, adjusted for restricted stock units, performance stock units, and stock options (the "Fully-Diluted Shares of Quantenna"), outstanding as of March 25, 2019, as provided by management. *Id.* Qatalyst also adjusted the UFCF and terminal value net present values for the degree of estimated dilution to current stockholders based on future dilution estimates from Quantenna management. *Id.*

53.    The Company does not provide the information Qatalyst utilized in the *Illustrative Discounted Cash Flow Analysis*. The Company did not disclose the values Qatalyst calculated for the dilution adjusted UFCF, the range of terminal values, the range of dilution adjusted terminal values, any of the inputs that went into calculating the Company's weighted average cost of capital, the estimated cash net of debt, nor the Fully-Diluted Shares of Quantenna. The Proxy also fails to disclose the inputs and assumptions that went into selecting the enterprise value to next-twelve-months estimated NOPAT multiple range of 12x-22x.

54.    Additionally, the Proxy fails to provide any of the above information in relation to the discounted cash flow analyses based on the sensitivities. This is all the more concerning due to the fact that sensitivity case is supposed to be the same as the full set of management projections but Qatalyst has calculated two different implied per share value ranges. *Id.* Qatalyst calculated a range of $19.93 to $34.26 for the management projections and a range of $19.07 to $34.26 for the sensitivity case.

55.    Since information was omitted, shareholders are unable to discern the veracity of Qatalyst' *Illustrative Discounted Cash Flow Analysis*. Without further disclosure, shareholders are unable to compare Qatalyst's calculations with the Company's financial projections. The absence of any single piece of the above information renders Qatalyst' *Illustrative Discounted*

- 16 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

*Cash Flow Analysis* incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

56.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

57.     Therefore, in order for Quantenna shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

58.     With respect to Qatalyst's *Selected Companies Analysis,* Qatalyst compared the price to earnings per share multiples for the calendar year 2020 ("CY2020E P/E Multiple") of the Company to selected companies.  Proxy 55.  There is a footnote attached to the multiples stating "[e]stimates generally based on non-GAAP statistics as defined by each company and explicitly excluding stock-based compensation, amortization of intangibles and other non-recurring items regardless of non-GAAP treatment." *Id.* at 55 n.\*.

59.     The Proxy does not disclose how the comparable companies' CY2020E P/E Multiple was impacted by non-uniform non-GAAP financials nor if any attempt was made to standardize the calculation.  It is unclear if any of the CY2020E P/E Multiple calculations have

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

any comparative value to Quantenna due to the possibly different formulation of the non-GAAP financials involved in the CY20E P/E Multiple calculations.

60.    In order to cure the materially misleading *Selected Companies Analysis*, each individual company's CY20E P/E Multiple calculation must be disclosed, or at the very least, the Company must disclose whether or not Qatalyst standardized the calculation. The absence of the above information renders Qatalyst' *Selected Companies Analysis* incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

61.    With respect to Qatalyst's *Selected Transaction Analysis*, Qatalyst reviewed the implied fully-diluted enterprise value of the target company as a multiple of (a) the revenue of the target company for the next twelve month period ("NTM Revenue Multiple") and (b) the price to earnings per share multiple for such next twelve month period ("NTM P/E Multiple"). *Id.* at 57. As in the *Selected Companies Analysis*, there is a footnote attached to the multiples stating "[e]stimates generally based on non-GAAP statistics as defined by each company and explicitly excluding stock-based compensation, amortization of intangibles and other non-recurring items regardless of non-GAAP treatment." *Id.* at 57 n.*.

62.    The Proxy does not disclose how the target companies' NTM P/E Multiple was impacted by non-uniform non-GAAP financials nor if any attempt was made to standardize the calculation.  It is unclear if any of the NTM P/E Multiple calculations have any comparative value to Quantenna due to the possibly different formulation of the non-GAAP financials involved in the NTM P/E Multiple calculations.

63.    Qatalyst also provides two different sets of means and medians, one set for the entire group of selected transactions and one set for target companies with less than 55% gross margins. *Id.* at 57.  Nowhere does the Proxy state which companies are included in the less than 55% gross margin group nor does it disclose what effect, if any, the less than 55% gross margin group had on Qatalyst's multiple range.

64.     Additionally, Qatalyst appears to have included old transactions in the analysis. 11 of the 39 selected transactions were announced prior to January 1, 2014. *Id.* at 56. It is unlikely that these transactions are still representative of current day transactions. Moreover, by including these transactions, the mean and median appear to be artificially lowered. The mean and median of all the selected companies for NTM Revenue Multiple was 3.7x and 3.1x, respectively. *Id.* at 57. The mean and median of all the selected companies for NTM P/E Multiples was 22.5x and 21.7x, respectively. *Id.* With respect to NTM Revenue Multiples, 8 of the 11 old transactions fall below the median and 9 out of the 11 fall below the mean. *Id.* at 56. With respect to NTM P/E Multiple, 7 of the 11 old transactions fall below the median and 8 of the 11 fall below the mean. *Id.* at 56.

65.     The failure to disclose each individual company's NTM P/E Multiple calculation, what target companies were in the group for less than 55% gross margins, and why the old transactions aren't stale is incomplete and materially misleading. Shareholders are unable to discern the veracity of the *Selected Transactions Analysis*. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

66.     In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Quantenna shareholders.

67.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

68.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

69.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

70.    As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

71.    The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

72.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

73.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

74.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

75.    Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

76.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

77.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

- 21 -
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

78.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

79.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

80.    Quantenna is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

81.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT III
### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

82.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

83.    The Individual Defendants acted as controlling persons of Quantenna within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Quantenna, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

84.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the Proxy.

86.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

87.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

88.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  May 10, 2019

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _/s/ Benjamin Heikali_____
Benjamin Heikali, Bar No. 307466
10866 Wilshire Blvd., Suite 1470
Los Angeles, CA 90024
Tel.: (424) 256-2884
Fax: 424.256.2885
Email: bheikali@faruqilaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**

Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*

- 24 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF**

I, Mark Kerry ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed a draft complaint against Quantenna Communications, Inc. ("Quantenna") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.    Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.    Plaintiff's transactions in Quantenna securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.    In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 10th day of May, 2019.

Mark Kerry

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 08/09/18 | 350 |
|  |  |  |
|  |  |  |